[Nos. 57041-8, 57196-1, 57253-4.   En Banc.   August 1, 1991.]

*In the Matter of the Personal Restraint of*
ROBERT PATRICK POWELL, *Petitioner.*

*In the Matter of the Personal Restraint of*
DOUGLAS THOMPSON, ET AL, *Petitioners.*

*In the Matter of the Personal Restraint of*
ROBERT NEIL HALSTIEN, *Petitioner.*

176

*Robert Neil Halstien*, pro se; *John B. Midgley* and *Patricia J. Arthur* of *Evergreen Legal Services*, for petitioners.

*Kenneth O. Eikenberry, Attorney General*, and *Thornton Wilson* and *Nicholas J. Betsacon, Assistants*, for respondent.

BRACHTENBACH, J. — Petitioners challenge the constitutionality of Substitute House Bill 1457, 51st Legislature (1989) (SHB 1457). Laws of 1989, ch. 259; RCW 9.95.009, .013, .115, .116. This statute requires that a minimum sentence which roughly conforms to Sentencing Reform Act of 1981 (SRA) criteria be set for inmates who, like petitioners, are serving mandatory life sentences for crimes committed before July 1, 1984. The main thrust of petitioners' challenge is that SHB 1457 extends the time to be served before a life inmate is eligible for parole beyond that called for by prior law and therefore violates the ex post facto clauses of the federal and state constitutions. They therefore seek to have SHB 1457 declared void so that the law in effect when they committed their crimes can be applied to determine their parole release date. Petitioners also make an equal protection challenge and a number of due process challenges.

We hold that SHB 1457 is not an ex post facto law as applied to prisoners who were not certified as parolable by the superintendents of their prisons as of the effective date of SHB 1457, but that it is an ex post facto law as applied to persons who were certified as parolable prior to that date. We also hold that a prosecutor's "updated" recommendation, required by SHB 1457, which is inconsistent with a plea agreement the prosecutor entered into is a violation of due process.

We therefore deny entirely the petition of Powell, who did not enter into a plea agreement and who was not certified as parolable before the effective date of SHB 1457. We grant the petitions of Halstien and Forsman,

but only to the extent necessary to remedy increases in the prosecutors' "updated" recommendations in their cases, since they did enter into plea agreements, but were not certified as parolable prior to the effective date of SHB 1457. Finally, we fully grant the petition of Thompson, who was certified as parolable when SHB 1457 took effect. We therefore hold that the law in effect at the time he committed his crime must be applied to determine his parole release date, regardless of whether that date is earlier or later than the SRA-consistent presumptive release he would have received under SHB 1457.

## FACTS

Each of the petitioners was convicted of first degree murder. The essential facts of the individual cases are as follows:

Douglas Thompson: Thompson asked his employee, LeAnn Christensen, to help him sell drugs. She agreed and the two went to Edmonds, Washington, in Thompson's car. While there, they dropped the drugs off at a local high school to be sold. The two then went to Seattle, where Ms. Christensen dropped Thompson off at a local tavern and continued on to the home of her boyfriend, Dick Wylie. Thompson eventually walked from the tavern to Mr. Wylie's house and demanded that Ms. Christensen leave with him. When she refused, he began to drag her out of the house. Mr. Wylie attempted to intervene on Ms. Christensen's behalf, at which point Mr. Thompson drew a pistol and threatened Mr. Wylie's life. Thompson eventually cooled down, put the gun away, and even went inside and had a drink with Ms. Christensen, Mr. Wylie and some of their friends. While inside, it was decided that Ms. Christensen would leave with Thompson.

Thompson and Ms. Christensen eventually returned to the high school in Edmonds where the unsold drugs were returned to them. Thompson then told Ms. Christensen he had something to do which would hurt her. She got out of the car and he returned to Seattle. He returned to Mr.

Wylie's house and knocked on the door. When Mr. Wylie answered, Mr. Thompson shot him in the chest with a shotgun which he kept in the trunk of his car, and then, once Mr. Wylie was on the ground, Thompson shot him twice more.

Following a jury trial, Thompson was found guilty of murder in the first degree with a special verdict of "armed with a deadly weapon, and a firearm." He was sentenced by the sentencing judge to a maximum term of life imprisonment. The sentencing judge recommended a minimum term of 15 years and the prosecuting attorney recommended that parole eligibility be determined pursuant to former RCW 9.95.115.

Robert Powell: Powell lived in a rooming house in Seattle with 21-year-old Dennis White. Powell was upset at Mr. White because he suspected Mr. White had stolen an old mirror and an old teakettle from the residence's community kitchen. In the early morning hours of December 11, 1975, Powell therefore beat and pistol-whipped Mr. White with a .22 caliber automatic pistol while Mr. White pleaded for his life. After cooling down, Powell handed the gun over to a third person who removed a bullet from the gun's chamber and inserted it into the ammunition clip. Powell eventually demanded the gun back, went into Mr. White's room, aimed the gun at him and pulled the trigger. Because there was no longer a bullet in the chamber, however, the gun did not fire, but merely went "click". Powell again aimed the gun at Mr. White, who had by this time changed his position, and again pulled the trigger. This time the gun went off, with the bullet entering Mr. White's chest.

Mr. White, who was at this point still able to move, began to gather his belongings, indicating that he was planning to leave. Powell ordered Mr. White to stop packing and told Mr. White that he would take him to the hospital. Once in the parking lot, however, Powell executed Mr. White, shooting him two more times in the chest and two times in the brain.

Following a jury trial, Powell was convicted of murder in the first degree, with a special verdict of "armed with a deadly weapon, and a firearm". He was sentenced by the sentencing judge to a maximum term of life imprisonment. The sentencing judge also recommended a minimum sentence of 20 years, while the prosecuting attorney recommended that the defendant never be paroled.

Terry Forsman and Robert Halstien: In the early morning hours of November 21, 1975, Forsman and Halstien broke into the house of John and Florence Standing, an elderly couple, through the rear window of their house. In the nights leading up to this break-in they had on numerous occasions discussed committing robberies, had once knocked on a neighbor's door to see if anyone was home, and had once knocked on the Standings' door and left after being refused admittance. They broke in hoping to steal the large amount of money they had heard the Standings kept in the house.

. Immediately after entering, Halstien forced his way into Mrs. Standing's bedroom, awakening Mrs. Standing. He then pulled her off the bed, violently pushed her around the room, cursed at her, and threatened her life if she did not give him her money. Forsman then entered the room, followed closely by Mr. Standing, who had been awakened as he slept in his separate bedroom. Mr. Standing ordered Halstien to leave his wife alone, upon which Halstien pointed the gun at Mr. Standing, told him he would kill him, and then shot him in the heart, killing him instantly. Mrs. Standing tried to free herself to assist her husband, but Forsman and Halstien beat her until she stopped. Both Forsman and Halstien then pointed guns at Mrs. Standing, threatening to kill her if she did not give them money. Once she had given them all the money she could find, they left.

Both Forsman and Halstien pleaded guilty to murder in the first degree (while armed with a deadly weapon and firearm). In return, they each received a maximum sen-

tence of life imprisonment and a minimum sentence recommendation of 20 years from both the sentencing judge and the prosecuting attorney.

At the time petitioners committed their crimes, a person convicted of first degree murder who did not receive a sentence of death or life imprisonment without possibility of parole automatically received a sentence of life imprisonment. RCW 9A.32.040 (1976). The Board of Prison Terms and Paroles (later redesignated the Indeterminate Sentence Review Board and hereinafter "the Board") did not obtain jurisdiction over a prisoner serving a life sentence for purposes of granting parole until the prisoner had served 20 years, minus good time served, and the prisoner had been certified parolable by the superintendent of the prison where the inmate was incarcerated. It is critical to note that the Board *had no authority* to *consider* parole release until *both* conditions had occurred, *i.e.*, service of a minimum of 20 years (less good-time credit, if any) *and* certification from the superintendent of the prison. Former RCW 9.95.115. As discussed hereafter, the certification of eligibility for parole was entirely discretionary with the superintendent.

Once both conditions had occurred, the Board still did not set a minimum sentence, but rather decided on an ad hoc basis whether to grant parole. Thus, although the judges and prosecutors involved in petitioners' cases tendered minimum sentence recommendations to the Board, the Board did not at that time set minimum sentences for petitioners.

In 1989, the Legislature enacted SHB 1457. Under it, the Board was directed to immediately set minimum sentences for all persons serving life sentences for crimes committed before July 1, 1984, and to make this minimum sentence generally conform to SRA standards and the "updated" recommendations of the prosecutor and sentencing judge. RCW 9.95.116, .009(2).

Petitioners have had their minimum sentences set accordingly. In almost all of the cases, the "updated" recommendations from the judge and prosecutor are higher than the original ones. In all of the cases, the minimum sentence received was longer than 20 years (Thompson's sentence set at 316 months, Powell's sentence set at 380 months, Halstien's sentence set at 360 months, Forsman's sentence set at 330 months). Only one of the petitioners, Thompson, was certified as parolable by the superintendent of his prison prior to the effective date of SHB 1457.

## ANALYSIS

Petitioners challenge SHB 1457 on a number of bases. First, they allege that it results in a potentially longer term of punishment than was provided for by prior law and is therefore an ex post facto law. Next, they claim that by treating similarly situated life inmates differently, depending on whether they happened to receive parole prior to SHB 1457's effective date, SHB 1457 violates equal protection principles. Finally, petitioners allege a number of ways in which SHB 1457 violates due process principles.

For petitioners to prevail in these challenges, they must show by a preponderance of the evidence that a constitutional error has caused them actual prejudice. *In re Cook*, 114 Wn.2d 802, 792 P.2d 506 (1990); *In re Williams*, 111 Wn.2d 353, 364, 759 P.2d 436 (1988).

## I
### EX POST FACTO CLAUSE

The ex post facto clauses forbid the State from enacting laws which impose punishment for an act which was not punishable when committed or increase the quantum of punishment annexed to the crime when it was committed. U.S. Const. art. 1, § 10, cl. 1; Const. art. 1, § 23; *see Weaver v. Graham*, 450 U.S. 24, 28-29, 67 L. Ed. 2d 17, 101 S. Ct. 960 (1981) (and cases cited therein). "Critical to relief under the *Ex Post Facto* Clause is not an

individual's right to less punishment, but the lack of fair notice and governmental restraint when the legislature increases punishment beyond what was prescribed when the crime was consummated." *Weaver*, at 30.

■ A law violates the ex post facto clause if it: (1) is substantive, as opposed to merely procedural; (2) is retrospective (applies to events which occurred before its enactment); and (3) disadvantages the person affected by it. *See Weaver v. Graham, supra* at 29; *Collins v. Youngblood*, ___ U.S. ___, 111 L. Ed. 2d 30, 110 S. Ct. 2715 (1990).

Taking the second part of the test first, there is no question here that SHB 1457 is retrospective. It was enacted after petitioners committed their crimes and it is being applied to them. *See, e.g., Weaver*, at 32-33. As to whether SHB 1457 is substantive or procedural, we will assume without deciding that it is substantive. The claims of petitioners Powell, Forsman and Halstien fail, however, because SHB 1457 does not, on balance, operate to their disadvantage.

Petitioners claim that SHB 1457 is disadvantageous because it has increased the amount of time which must be served before an inmate has an opportunity for parole. We disagree. Although it has apparently increased the time which must be served before the inmate's first possibility of parole release, it has also made the possibility which the inmate ultimately receives much more determinate. When these negative and ameliorative aspects of SHB 1457 are weighed against one another, it is clear that what is gained in determinacy more than makes up for what is lost in terms of the possibility of early release. SHB 1457 therefore works to the advantage, not the disadvantage, of inmates and is consequently not ex post facto.

A. Statutory Framework.

When petitioners were convicted, the sentencing court was required to set their maximum sentence at life

imprisonment. RCW 9A.32.040, 9.95.010. Former RCW 9.95.115 provided for the possibility of parole:

> The board of prison terms and paroles is hereby granted authority to parole any person sentenced to the penitentiary or the reformatory, under a mandatory life sentence, who has been continuously confined therein for a period of twenty consecutive years less earned good time: *Provided, The superintendent of the penitentiary or the reformatory, as the case may be, certifies to the board of prison terms and paroles that such person's conduct and work have been meritorious, and based thereon, recommends parole for such person . . ..*

(Italics ours.) The provisions of RCW 9.95.040, which required the Board to set minimum sentences, were not applied to persons serving mandatory life sentences.[1] Thus, persons serving mandatory life sentences never knew, until the day they were actually considered for parole, whether and when they would be considered for parole.

With the enactment of the SRA, RCW 9.95.009(2) was added to require the Board to set the minimum terms required by RCW 9.95.040 in accordance with the SRA and the prosecutor's and judge's minimum sentence recommendations. This requirement was still not applied to life inmates.

In 1989 the Legislature enacted SHB 1457, which made RCW 9.95.009(2) applicable to mandatory life sentences:

> The board shall fix the duration of confinement for persons committed to the custody of the department of corrections under a mandatory life sentence for a crime or crimes committed before July 1, 1984. . . .

RCW 9.95.116(1).

> After July 1, 1984, the board shall continue its functions with respect to persons convicted of crimes committed prior to July 1, 1984, and committed to the department of corrections. When making decisions on duration of confinement, *including those relating to persons committed under a mandatory life sentence,* and parole release under RCW 9.95.100

---

[1] A minimum sentence, also designated "duration of confinement" in the statutes, sets the date at which a prisoner first becomes eligible for parole. RCW 9.95.110.

and 9.95.110, the board shall consider the purposes, standards, and sentencing ranges adopted pursuant to RCW 9.94A.040 and the minimum term recommendations of the sentencing judge and prosecuting attorney, and shall attempt to make decisions reasonably consistent with those ranges, standards, purposes, and recommendations: *Provided*, That the board and its successors shall give adequate written reasons whenever a minimum term or parole release decision is made which is outside the sentencing ranges adopted pursuant to RCW 9.94A.040. . ..

(Italics ours.) RCW 9.95.009(2). RCW 9.95.115 was also changed so that the requirement of superintendent recommendation for parole was eliminated. Laws of 1989, ch. 259, § 3.

The parties agree that the effect of SHB 1457 is to require the Board to begin setting minimum sentences for persons serving mandatory life terms (using the SRA and various recommendations as guidelines) where it was not required to do so before.

B. Disadvantageous Versus Ameliorative Aspects of SHB 1457.

Petitioners argue that SHB 1457 pushes back the date at which they may be considered for parole. They point out that under former RCW 9.95.115 they could be considered for parole as early as 20 years (minus good time) from the day they began serving their sentence. On the other hand, SHB 1457 (RCW 9.95.009(2), .116) requires that the Board set a minimum term of imprisonment for persons serving mandatory life sentences. This section also requires that this term be "reasonably consistent" with SRA guidelines. Absent exceptional circumstances and written reasons justifying departure, the Board's minimum term decisions under section .009(2) must conform to the SRA. *Addleman v. Board of Prison Terms & Paroles*, 107 Wn.2d 503, 511, 730 P.2d 1327 (1986). Therefore, it can be assumed that the Board will follow SRA guidelines in setting minimum terms. Under the SRA, a mandatory minimum of 20 years is imposed, RCW 9.94A.120(4), but that minimum is on the very low end of the possible sentences which may be received, RCW

9.94A.310(1) (lowest possible sentence with an offender score of 0). It is therefore unlikely that a 20-year minimum term will be given under the SRA to a person serving a mandatory life term. In fact, the sentences given to petitioners in this case clustered in the 25- to 27-year range. Thus, argue petitioners, since adherence to the SRA actually results in a longer period of incarceration before they can be considered for parole, the law which requires that adherence works to their disadvantage and is ex post facto.

We begin by noting that because of the brutal and coldblooded nature of their crimes, petitioners were sentenced to remain in prison for the rest of their lives. Thus, even were they to receive parole, petitioners would never be truly "free", but would always be subject to the terms of their parole. *See* RCW 9.95.100, .110, .115. Moreover, because of the unique nature of the crime of first degree murder and the people who commit that crime, the possibility of even receiving parole in cases like petitioners' has only been legislatively authorized in this state since 1951. *See* Laws of 1947, ch. 92, § 1, p. 598; *In re George*, 90 Wn.2d 90, 93, 579 P.2d 354 (1978). We therefore feel compelled to reiterate that the purpose of the ex post facto clause *is not* to insure "an individual's right to less punishment", because certainly petitioners are not entitled to less punishment, but merely to provide for "fair notice and governmental restraint". *Weaver*, at 30. With these principles in mind, we turn to our analysis of petitioners' ex post facto claims.

The threshold question in determining whether a law which affects parole is disadvantageous to prisoners is whether the law alters the "standard of punishment" which existed under prior law. *Lindsey v. Washington*, 301 U.S. 397, 401, 81 L. Ed. 1182, 57 S. Ct. 797 (1937). We agree with petitioners that the standard of punishment under SHB 1457 is different from that under former RCW 9.95.115, in that the nature of the parole decision has been changed. A process which was once entirely encom-

passed within the discretion of the Board and prison superintendent has been transformed into one which sharply circumscribes the Board's discretion and entirely eliminates that of the superintendent. The next question is whether this change in the standard of punishment works to the disadvantage of petitioners. *See Lindsey*, at 401. We hold that it does not.

Petitioners seek to measure the 20-year time limit of former RCW 9.95.115 against the new SRA-consistent time limit of SHB 1457 in order to show that SHB 1457 is disadvantageous. Their reliance on this direct comparison is misplaced. The two cannot be laid side by side and measured against one another because they are structurally and functionally different. Under former RCW 9.95-.115, the 20-year time limit (in addition to the superintendent's certification) was merely the starting point, after which the machinery of the parole process could begin to operate. It was the point at which the Board obtained "jurisdiction" of the inmate for purposes of determining parole; the point after which the Board could exercise its virtually unlimited discretion to determine whether to parole the inmate. Under SHB 1457, however, an inmate need not wait 20 years minus good time for the wheels of the parole process to begin turning. That process begins immediately, with the Board setting a minimum sentence *reasonably consistent with the SRA*. RCW 9.95.009(2), .040. The inmate must then wait until the end of that minimum term before he or she will actually be considered for parole. The minimum term which the Board sets may, and often will, be longer than 20 years, but at the end of it the inmate *knows* that he or she will be considered for parole, in marked contrast to former RCW 9.95.115, which gave the inmate no clue as to when he or she would *actually* be considered for parole.

■ Thus, the nature of the two time limits is different and a mere quantitative comparison of time limit versus time limit is inappropriate. The proper analysis requires that we carefully balance any disadvantageous aspects of

SHB 1457 against its ameliorative effects. *See Weaver*, at 33; *Dobbert v. Florida*, 432 U.S. 282, 294-95, 53 L. Ed. 2d 344, 97 S. Ct. 2290, *reh'g denied*, 434 U.S. 882 (1977). As the United States Supreme Court has said, "[w]e must compare the two statutory procedures *in toto* to determine if the new may be fairly characterized as more onerous." *Dobbert*, at 294.

We have already noted the disadvantageous aspects of SHB 1457. It *appears* to extend the time before which an inmate can be considered for parole. Petitioners analogize this situation to that in *Weaver v. Graham*, 450 U.S. 24, 67 L. Ed. 2d 17, 101 S. Ct. 960 (1981), in which a statute negatively affecting an inmate's ability to earn good time credits, and therefore early release, was struck down as violative of the ex post facto clause.

In *Weaver*, the Florida Legislature had reduced the amount of good-time credit which could be automatically accumulated per month and applied this change retro-spectively to prisoners who had been sentenced before the enactment of the legislation. The Supreme Court held this to be an ex post facto law, finding that reduction in good-time credits necessarily increases the time spent in prison and is therefore detrimental to the prisoner. The pri-soners were "disadvantaged by the reduced *opportunity* to shorten [their] time in prison . . .." (Italics ours.) *Weaver*, at 33-34.

Petitioners claim that the difference in time limits in the present case has similarly "reduced" their "oppor-tunity" for early release and that the ex post facto analysis must therefore be resolved in their favor. They are mistaken.

▆▆▆ We agree that in one sense SHB 1457 reduces the *possibility* of release prior to the end of the SRA-consistent term. It is possible that under former RCW 9.95.115 the prison superintendent might certify the prisoner as parolable prior to that time and it is possible that the Board might have granted parole prior to that time. This is not the whole story, however. SHB 1457 also

has an ameliorative aspect, represented by the abolition of the superintendent certification requirement. Under former RCW 9.95.115, a prisoner's first opportunity to be considered for parole by the Board was after 20 years minus good time *AND* certification from the prison superintendent that the prisoner was parolable. Former RCW 9.95.115. Until the Board received the superintendent's certification it could not consider the prisoner for parole. This decision whether to grant certification was entirely within the discretion of the superintendent. *See* former RCW 9.95.115; *In re Baker*, 44 Wn. App. 116, 121, 720 P.2d 870 (1986). Therefore, under former RCW 9.95.115, a prisoner did not have an "opportunity" for "early release" until the superintendent had exercised his virtually unfettered discretion. It is therefore conceivable that under former RCW 9.95.115, a prisoner would *never* have had the opportunity to be considered for parole by the Board and therefore would *never* have had an "opportunity" for "early release".

Substitute House Bill 1457 does away with this problem by eliminating the requirement of superintendent certification. Each prisoner must now be considered for parole at a set time. Therefore, far from constricting the opportunity for early release, SHB 1457 ameliorates the harshness inherent in former RCW 9.95.115, which allowed for the possibility that a prisoner might never be considered for parole.

This ameliorative effect advantages inmates more than the reduction in the possibility of early release disadvantages them. The possibility of never even being considered for parole by the Board has been transformed to a *certainty* of being considered. While SHB 1457 admittedly pushes back the first possibility of parole release, its elimination of the superintendent's certification requirement makes the possibility which the inmate *does* get more determinate and therefore more meaningful. SHB 1457 therefore, on balance, works to inmates' benefit and is not ex post facto.

Petitioners claim, however, that as a practical matter, the superintendent always certified inmates as parolable at the end of 20 years minus good time and that therefore SHB 1457 is not actually ameliorative. We first note that petitioners have provided us with no data to support this proposition. Even if they did, it would avail them nothing. The constitution prohibits ex post facto "laws". For a law to be ex post facto, it must detrimentally alter the standard of punishment called for by a prior *law*, not by a prior administrative practice which was not required by that law. *See Warren v. United States Parole Comm'n*, 659 F.2d 183, 195-96 (D.C. Cir. 1981), *cert. denied*, 455 U.S. 950 (1982); *see also Watson v. Estelle*, 886 F.2d 1093, 1096 (9th Cir. 1989) (and cases cited therein).

The reason for this is clear. One of the primary justifications of the ex post facto clause is that "legislative Acts [should] give fair warning of their effect and permit individuals to rely on their meaning until explicitly changed." (Citations omitted.) *Weaver*, at 28-29; *see also Dufresne v. Baer*, 744 F.2d 1543, 1546, 1548 (11th Cir. 1984), *cert. denied*, 474 U.S. 817 (1985). At the time they committed their murders, each of the petitioners might have thought that the usual administrative practice was to grant certification at the expiration of 20 years minus good time, but given the superintendent discretion expressly provided for in former RCW 9.95.115, they could not have been certain that the practice would be followed in their cases. Because the statute provided that certification did not *have to* be given at the end of 20 years minus good time, petitioners were provided with "fair warning" that their individual certifications might occur much later, or never. *See Dufresne*, at 1548.

The "fair warning" with which the ex post facto clause is concerned is provided by prior statutes, not prior administrative practice not required by its authorizing legislation. In fact, petitioners have admitted as much. See Reply Brief of Petitioners Powell, Thompson and Forsman, at 24. The relevant benchmark for determining

whether a law is ex post facto is therefore the prior "law" and as we have already shown, the prior law in this case, as written, was harsher than SHB 1457.

Petitioners cite a number of cases to support their argument, none of which is persuasive. In *Addleman v. Board of Prison Terms & Paroles*, 107 Wn.2d 503, 730 P.2d 1327 (1986), the petitioner claimed that the proposed statutory abolition of the Parole Board in 1988 would violate the ex post facto clause because there would no longer be any entity authorized to "waive certain mandatory minimum terms . . . recompute minimum terms at any time . . . and to grant 'good time' credits," *Addleman*, at 506, in other words, to discretionarily reduce sentences. The court agreed, noting that the "new provision constricts the inmate's *opportunity* to earn early release" and is therefore more onerous on the inmate. (Italics ours.) *Addleman*, at 506 (quoting *Weaver v. Graham, supra*). Petitioners argue that SHB 1457 similarly reduces their "opportunity" to earn early release, if not by eliminating the Board entirely, by limiting its exercise of discretion so that it cannot grant parole at 20 years minus good time as it could under former RCW 9.95.115.

There are two problems with using *Addleman* in this way. First, the ex post facto discussion in *Addleman* is dicta. The issue was not ripe in that case because the Board had not yet been abolished, and the issue was moot because the Legislature had already provided for the Indeterminate Sentence Review Board to replace and take over the functions of the Board of Prison Terms and Paroles. *Addleman*, at 507.

Second, there is a fundamental difference between the changes complained of in *Addleman* and those complained of in this case. Elimination of the Board in *Addleman* completely eliminated the possibility of release earlier than the minimum term which had already been set. It *did* entirely eliminate the "opportunity to earn early release". In stark contrast, by eliminating the certification requirement, SHB 1457 has made the opportunity for

early release mandatory. Far from eliminating the opportunity for early release, SHB 1457 *creates* an opportunity which may not have materialized under prior law. *Addleman* is therefore of no assistance to petitioners.

Petitioners also cite a number of cases for the general proposition that "[a]dverse changes in the . . . time at which a prisoner first becomes *eligible for parole consideration* may . . . violate the ex post facto clause." *Yamamoto v. U.S. Parole Comm'n*, 794 F.2d 1295, 1300 (8th Cir. 1986) (citing *United States ex rel. Graham v. United States Parole Comm'n*, 629 F.2d 1040, 1043 (5th Cir. 1980); *Rodriguez v. United States Parole Comm'n*, 594 F.2d 170, 175-76 (7th Cir. 1979)); *see also Warden, Lewisburg Penitentiary v. Marrero*, 417 U.S. 653, 663, 41 L. Ed. 2d 383, 94 S. Ct. 2532 ("a repealer of parole eligibility previously available to imprisoned offenders would clearly present [a] serious question under the *ex post facto* clause"), *reh'g denied*, 419 U.S. 1014 (1974); *Devine v. New Mexico Dep't of Corrections*, 866 F.2d 339 (10th Cir. 1989).

The Supreme Court has never held that such a change *does* violate the ex post facto clause. *See Akins v. Snow*, 922 F.2d 1558, 1563 (11th Cir. 1991). Regardless, we fail to see how the cases cited by petitioners are relevant to the disposition of this case. SHB 1457 has worked no adverse change in the time of parole eligibility. As already pointed out, SHB 1457 actually ameliorates the inmates' parole consideration situation by eliminating the superintendent certification requirement. Thus, eligibility for parole consideration has not been adversely changed or repealed, but has merely been made more definite.

Petitioners also rely on the California case of *In re Stanworth*, 33 Cal. 3d 176, 654 P.2d 1311, 187 Cal. Rptr. 783 (1982). In that case, the petitioner was sentenced to a mandatory life term under California's Indeterminate Sentence Law (ISL). California then enacted a Determinate Sentence Law (DSL). Petitioner's parole release date was determined in accordance with the administra-

tive guidelines enacted pursuant to the DSL. The California court found this to be an ex post facto violation because, among other things, the goals of the two statutory schemes were different. The ISL was aimed toward rehabilitation and was therefore concerned with an individual assessment of each inmate whereas the goals under the DSL were punishment and uniformity, lessening the importance of individual considerations.

*Stanworth* is inapposite for two reasons. First, the court in *Stanworth* did not have before it the same statutes which are at issue here. Neither the ISL nor the DSL at issue in *Stanworth* included anything analogous to the superintendent certification requirement of former RCW 9.95.115 or the elimination of that requirement in SHB 1457. This peculiarity of the Washington parole scheme makes our analysis necessarily unique and therefore renders *Stanworth* of little assistance.

Even if *Stanworth* were on point, we would decline to follow it because its analysis is faulty. There, the court found that the DSL changed the standard of punishment "because postconviction behavior is no longer utilized in the same manner" in determining parole release dates. *Stanworth*, at 187. The court then went on to find that this change in the standard of punishment "may well be to defendant's disadvantage because his postconviction behavior has been given different weight in the fixing of his term." *Stanworth*, at 187. As has already been noted, in order to find an ex post facto violation, a court must find *both* that the standard of punishment has changed *and* that this change works to prisoners' disadvantage. The court in *Stanworth* failed to carry out both of these steps. Rather, it assumed that the change in the standard of punishment "*may*" have worked to the disadvantage of the defendant, and upon that assumption found an ex post facto violation. We decline to follow *Stanworth* in this regard.

When the foregoing analysis is applied to the facts of the present case, it is clear that petitioners Forsman,

Powell, and Halstien have not been disadvantaged by the application of SHB 1457. SHB 1457 eliminates the certification requirement, thus making their opportunity for early release more determinate and ameliorating their punishment. We therefore hold that, as applied to petitioners Halstien, Powell, and Forsman, SHB 1457 is not an ex post facto law.

■ Petitioner Thompson, however, is in a different situation. He was certified as parolable by the superintendent of McNeil Island Penitentiary on March 7, 1989, before the effective date of SHB 1457. The elimination of the certification requirement therefore will have no ameliorative effect on him, since he has already been certified. We therefore hold that, as applied to him and others like him, SHB 1457 is an ex post facto law and therefore void. Petitioner Thompson and others like him will have their parole release determined according to former RCW 9.95.115, the law in effect when they committed their crimes. *See Weaver v. Graham*, 450 U.S. 24, 36 n.22, 67 L. Ed. 2d 17, 101 S. Ct. 960 (1981).

We are careful to note this does not mean petitioner Thompson must be immediately paroled or even that he must be paroled by the expiration of the SRA-consistent minimum term he would have received under SHB 1457. What it means is that petitioner Thompson is, as he was prior to the enactment of SHB 1457, subject entirely to the discretion of the Board, which may parole him now or never. RCW 9.95.100, .110; former RCW 9.95.115.

## II
### Equal Protection Clause

■ Petitioners argue that SHB 1457 violates their equal protection rights under the fourteenth amendment to the federal constitution, U.S. Const. amend. 14, § 1, because it arbitrarily creates a class of prisoners who are punished more than other prisoners. Petitioners claim that of all prisoners who were sentenced to mandatory life terms for murder prior to 1984, those who have had their

minimum sentences determined under SHB 1457 are being arbitrarily discriminated against because they are receiving longer sentences than those who were paroled prior to the effective date of SHB 1457. Petitioners also claim that this scheme violates the Washington privileges and immunities clause, Const. art. 1, § 12. However, since they have cited no authority to suggest that the analysis under that provision should be any different than under the federal provision, we do not decide the issue. *See In re Rupe*, 115 Wn.2d 379, 396, 798 P.2d 780 (1990). Since we have already decided in petitioner Thompson's favor on the ex post facto issue, decision of this issue is moot as to him.

The premise of petitioners' equal protection argument is flawed. Petitioners are *not* necessarily serving longer sentences under SHB 1457 than they would have under former RCW 9.95.115. As a result, they have not shown any disadvantage resulting from the enactment of SHB 1457. They therefore lack standing to challenge it on equal protection grounds. "One who is not adversely affected by a statute may not question its validity." *Haberman v. WPPSS*, 109 Wn.2d 107, 138, 744 P.2d 1032, 750 P.2d 254 (1987) (citing *State v. Carroll*, 81 Wn.2d 95, 103-04, 500 P.2d 115 (1972)), *appeal dismissed*, 488 U.S. 805 (1988); *see also State v. Farmer*, 116 Wn.2d 414, 421, 805 P.2d 200 (1991); *High Tide Seafoods v. State*, 106 Wn.2d 695, 701, 725 P.2d 411 (1986), *appeal dismissed*, 479 U.S. 1073 (1987); *State v. Lundquist*, 60 Wn.2d 397, 401, 374 P.2d 246 (1962). We therefore do not reach petitioners' equal protection challenge. Because of our finding that SHB 1457 is not disadvantageous to inmates to whom it is applied, none of those inmates can have standing to challenge SHB 1457 on equal protection grounds in the future. For those inmates like Thompson to whom SHB 1457 may not be applied because they have already received superintendent certification, the equal protection question is moot.

## III
### DUE PROCESS CLAUSE

Petitioners allege a number of different ways in which the enactment and application of SHB 1457 has operated to deny them the due process of law guaranteed by the fourteenth amendment to the federal constitution, U.S. Const. amend. 14, § 1.

A. Prosecutor's Violation of Plea Agreement.

Petitioners Halstien and Forsman pleaded guilty to their crimes. As part of the plea agreement, the prosecutor agreed to recommend that the minimum sentence be 20 years. The judge accepted the pleas and agreed to recommend to the Board that the minimum sentence be 20 years. Pursuant to SHB 1457, the prosecutor and judge were required to submit "updated" minimum sentence recommendations to aid the Board in its setting of petitioners' actual minimum terms. RCW 9.95.116(2), .030. This they did. In Halstien's case, they each suggested 35 years. In Forsman's case, the judge suggested 30 years, while the prosecutor suggested 35 years. These changes in position were based on adherence to SRA sentencing standards. Upon being informed that their updated recommendations were inconsistent with the plea agreements, the prosecutor's office withdrew them, but not until after the Board had set petitioners' minimum terms. The Board has conceded that it must redetermine petitioners' sentences in light of the recommended sentences contained in the plea agreements.

There is no disagreement among the parties that these violations of the plea agreements do not comport with due process and must therefore be remedied. *See State v. Schaupp*, 111 Wn.2d 34, 757 P.2d 970 (1988); *State v. Miller*, 110 Wn.2d 528, 756 P.2d 122 (1988); *State v. Tourtellotte*, 88 Wn.2d 579, 564 P.2d 799 (1977). The only question regards the proper remedy. Petitioner Forsman agrees with the Board that remand to the Board for redetermination of his minimum sentence in light of the prosecutor's original recommendation is appropriate. Peti-

tioner Halstien claims that the plea agreement should be enforced against the Board so that his minimum sentence actually be set at 20 years.

█ Specific performance is one of the two remedies which a defendant can seek when a prosecutor has breached a plea agreement and it is the only one sought here. *Miller*, at 535. Halstien argues that the remedy of specific performance means that he can require the Board to set his minimum sentence in conformance with the 20-year sentence which the prosecutor initially agreed to recommend. The prosecutor, however, has no authority to bind the Board. *See* RCW 9.95.009(2). Moreover, even if the prosecutor did have such power, it did not promise an actual minimum term, but only promised to recommend one. This case is therefore distinguishable from *State v. Cosner*, 85 Wn.2d 45, 530 P.2d 317 (1975), where this court required the Board to set a minimum term in conformance with the prosecutor's representation of what defendant's minimum *would be*, even though this resulted in a sentence which was less than the mandatory minimum for the crime. In the present case, there was no representation of what the sentence *would be*, but only what the prosecutor would recommend that it be.

We therefore hold that in the context of this case, specific performance of the plea bargain only requires that the prosecutor recommend what he or she agreed to recommend. We note that this holding is not inconsistent with *State v. Gray*, 25 Wn. App. 789, 612 P.2d 401 (1980). The court in *Gray* did not consider whether the Board was required to follow a plea agreement, but limited its consideration to the issue of the proper remedy for an "improperly" imposed minimum sentence. *Gray* is therefore inapposite.

We therefore remand to the Board for redetermination of the minimum sentences of petitioners Forsman and Halstien, taking into account the prosecutor's revised "updated" recommendations. *See State v. Collins*, 46 Wn. App. 636, 641-42, 731 P.2d 1157 (1987). We are careful to

note, however, that the Board's decision after reconsideration need not differ from its prior decision. The decision is still the Board's. We will not review the Board's ultimate decision on the ground that not enough weight was given to the prosecutor's original recommendation in the plea agreement.

The Board argues, however, that remand is not always appropriate or necessary. It argues that where a higher "updated" recommendation is made, but is not set forth by the Board as one of the reasons justifying its decision, any error is harmless since the Board did not rely on the recommendation in setting the minimum sentence. This argument is specious, since RCW 9.95.116(2) points out that the Board shall consider the prosecutor's "updated" recommendation in setting a minimum sentence. Therefore, the fact that the recommendation does not appear in the Board's justification of its decision is irrelevant.

B. In-Person Hearing in Front of Sentencing Judge.

Petitioners Forsman and Thompson argue due process requires they be allowed to personally address the sentencing judge before that judge is allowed to suggest a minimum term substantially greater than the one the judge recommended at the time of the original sentencing.

Petitioners correctly point out that it is a violation of due process to modify a sentence in a defendant's absence, *United States v. Behrens*, 375 U.S. 162, 11 L. Ed. 2d 224, 84 S. Ct. 295 (1963), or to deny a defendant the opportunity to speak immediately prior to the imposition of a sentence, *State v. Happy*, 94 Wn.2d 791, 620 P.2d 97 (1980). The present case is distinguishable from the cases petitioners cite, however. In *Behrens* and *Happy*, a hearing before the judge was required because the judge was the one actually fixing the sentence, whereas in the present case, the judge is not the one making the ultimate sentencing decision. Instead, the judge merely submits a recommendation to the Board. The cited cases therefore do not mandate a hearing before the trial judge.

The Board argues that such a hearing is not required because there are already sufficient procedural safeguards in place. *In re Sinka*, 92 Wn.2d 555, 599 P.2d 1275 (1979) supports the Board's position. In *Sinka*, one of the questions presented was whether the statutory procedure for the setting of minimum terms set out in former RCW 9.95.009(2) comported with due process. This court found that it did, noting that only minimal due process protections applied to the setting of a minimum term because "the setting of a minimum term is not part of a criminal prosecution." *Sinka*, at 566. The holding that Board procedures satisfied due process was based in large part on the fact that the inmate had a right to be heard by the Board before the minimum sentence was set. This right remains unchanged. However, one thing has changed under the new statute — the "updated" recommendations. Since the judge's "updated" recommendation is the heart of petitioners' challenge, *Sinka*, although helpful to the Board, is not controlling.

This dearth of controlling authority requires resort to the *Mathews v. Eldridge*, 424 U.S. 319, 47 L. Ed. 2d 18, 96 S. Ct. 893 (1976) balancing test. Under this test, whether and when a hearing is required to insure due process is determined by balancing three factors:

First, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and finally, the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail.

*Mathews*, at 335.

The interest affected in these cases is petitioners' liberty interest in the setting of a minimum sentence. This is a tenuous liberty interest at best because a minimum sentence does not actually establish a release date; the prisoner has no "right" to release prior to serving his or her maximum sentence. *Greenholtz v. Inmates*

*of Nebraska Penal & Correctional Complex*, 442 U.S. 1, 7, 60 L. Ed. 2d 668, 99 S. Ct. 2100 (1979). Moreover, as *Sinka* points out, only minimal procedural protections are required because the setting of a minimum sentence is not part of a criminal prosecution. *Sinka*, at 566.

The risk of erroneously depriving petitioners of this right by not allowing them to address the sentencing judge before the judge updates his or her recommendation is minimal. Although the Board is required to give "great weight" to the judge's recommendation, *In re Irwin*, 110 Wn.2d 175, 182, 751 P.2d 289 (1988), an additional hearing would be of little extra value because the inmate is already provided a hearing before the Board wherein the inmate can make the same arguments he or she would have made to the judge.

Finally, requiring another hearing would not only be a drain on the State's resources in this case, but a holding that one is required would necessitate more hearings, both in cases where judges have already increased their recommendations and also in all future cases where the judge might increase his or her recommendation, *i.e.*, all future cases. This would necessarily entail a great administrative and fiscal burden on an already overburdened criminal justice system.

We therefore hold that a hearing before the sentencing judge is not required before the judge is allowed to update the recommended minimum sentence. The hearing in front of the Board which is presently provided for by statute is sufficient process to assure a fair minimum sentence.

C. Need for Parolability Hearing.

Petitioners Powell and Halstien seem to argue that failure of the Board to consider them for parole at the end of their mandatory minimum terms of confinement is a violation of due process. Fundamental to this argument is the presumption that the applicable statutory scheme or agency regulations have created an entitlement to, or

liberty interest in, such a hearing, since "[t]here is no constitutional or inherent right of a convicted person to be conditionally released before the expiration of a valid sentence." *Greenholtz*, at 7.

Petitioners rely on *Bergen v. Spaulding*, 881 F.2d 719 (9th Cir. 1989) to create this liberty interest. In that case, the Ninth Circuit found such a liberty interest, stating that "[t]he Board did not have discretion to decide without a hearing that Bergen should remain in prison beyond his . . . GTRD [good-time release date] [*i.e.*, minimum sentence]." *Bergen*, at 722.

*Bergen*, however, is distinguishable.[2] In that case, there had already been a preliminary hearing at which a preliminary release date had been set. *Bergen*, at 720. This court has held that the setting of such a "preliminary release date" creates a "potential conditional liberty" interest which requires minimal due process protection, including a hearing before it is changed. *Monohan v. Burdman*, 84 Wn.2d 922, 927-29, 530 P.2d 334 (1975). No such "preliminary release date" has been set for any of the petitioners in the present case, nor need it be.

Under the relevant statutes, "petitioners do not have a protected liberty interest in parole release at the expiration of the Board set minimum terms . . .." *In re Ayers*, 105 Wn.2d 161, 163, 713 P.2d 88 (1986). There is therefore no statute or court ruling which creates in petitioners an entitlement to the hearing they seek. Likewise, there is no Board regulation which mandates either the setting of a preliminary release date or a hearing at the end of the mandatory minimum term of a person sentenced to a mandatory life term. Since petitioners have no liberty interest at stake, they have no right to a hearing, and we so hold.

---

[2]We also question *Bergen*'s analysis of Washington law, especially its incomplete analysis of *In re Piercy*, 101 Wn.2d 490, 681 P.2d 223 (1984) and its failure to adequately address *In re Ayers*, 105 Wn.2d 161, 713 P.2d 88 (1986). *See Bergen*, at 722.

### D. Loss of Good-Time Credits.

Petitioners Halstien and Powell argue that "resetting" their minimum sentences from 20 years to 20-plus years has the result of denying them the good-time credits they have earned up to this point. This argument is based on a profound misinterpretation of what the Board has done. The Board has merely set a minimum term for petitioners. Their good-time credits are still there, they just serve to reduce a sentence which is longer than the one petitioners might have thought the credits would be reducing. This argument is entirely without merit.

### E. Involuntary Plea Bargain.

Petitioner Halstien raises an argument for the first time in the "Conclusion" section of his pro se petition which seems to say that because he was not notified of the SRA-consistent minimum sentence which he has received under SHB 1457 at the time he entered into his plea agreement, his guilty plea was not voluntary, knowing, or intelligent. He cites one case, *Carter v. McCarthy*, 806 F.2d 1373 (9th Cir. 1986).

In *Carter*, the judge failed to inform the defendant of the 3-year parole which was statutorily required to follow his 2-year sentence. The Ninth Circuit held that because defendant did not know about the extra 3 years that would be statutorily tacked onto the sentence he agreed to serve, his agreement was not knowing and voluntary. The present case is quite different. Petitioner received a life sentence and therefore knew that regardless of when and if he was ever released, he would spend every moment after that on parole. There is no "hidden parole" in this case. *Carter* is therefore not on point. We have found no case which supports petitioner Halstien's position. Petitioner Halstien's argument is meritless and we so hold.

IV

CONCLUSION

In conclusion, we hold that SHB 1457 is not an ex post facto law, except as it is applied to persons who have been certified as parolable by the superintendents of their prisons before the effective date of SHB 1457. The Board was therefore acting properly when it set the minimum sentences of petitioners Powell, Halstien, and Forsman. The Board was acting improperly when it set a new minimum sentence for petitioner Thompso, however, since he was certified as parolable prior to the effective date of SHB 1457. Petitioner Thompson is to have his parole date determined according to former RCW 9.95.115.

We do not decide whether SHB 1457 violates the federal equal protection clause or the Washington privileges and immunities clause because any petitioners as to whom the issue is not moot lack standing to challenge the statute on either of those bases.

We hold that the setting of minimum sentences pursuant to consideration of updated prosecutor recommendations which exceed the recommendations contained in a plea agreement violates due process. We therefore hold that all such minimum sentences, including those of petitioners Halstien and Forsman, must be reset. This does not, however, mean the new minimum sentence must be different than the one originally given.

We also hold that none of petitioners' other due process claims have merit.

We therefore deny entirely the petition of Powell, who did not enter into a plea agreement and who was not certified as parolable before the effective date of SHB 1457. We grant the petitions of Halstien and Forsman to the extent necessary to remedy increases in the prosecutors' "updated" recommendations in their cases,

since they did enter into plea agreements, but were not certified as parolable prior to the effective date of SHB 1457. Finally, we fully grant the petition of Thompson, who was certified as parolable when SHB 1457 took effect. We therefore hold that the law in effect at the time he committed his crime must be applied to determine his parole release date, regardless of whether that date is earlier or later than the SRA-consistent presumptive release he would have received under SHB 1457.

Finally, we address a motion by petitioner Halstien, asking us to strike a document entitled "Supplemental Response" provided by the assistant attorney general on behalf of the Board and also asking us to impose sanctions and costs on this attorney. Because there is no basis upon which to grant the motion, we hereby deny it.

DOLLIVER, ANDERSEN, DURHAM, and GUY, JJ., concur.

UTTER, J. (dissenting) — The ex post facto clauses of the federal and state constitutions[3] prohibit Congress and the states from enacting laws which make an act punishable which was not punishable when committed, or which impose additional punishment to that then prescribed. *Weaver v. Graham*, 450 U.S. 24, 28, 67 L. Ed. 2d 17, 101 S. Ct. 960 (1981). The majority holds Substitute House Bill 1457 (SHB 1457)[4] is not an ex post facto law as applied to prisoners who were not certified as parolable as of the effective date of the law (petitioners Powell, Forsman and Halstien), but is an ex post facto violation as applied to those who were certified prior to that date (petitioner Thompson). Whether or not a prisoner has been certified is irrelevant. The law in effect at the time

---

[3]U.S. Const. art. 1, § 9, cl. 3; U.S. Const. art. 1, § 10, cl. 1; Const. art. 1, § 23. Hereinafter, I will refer simply to the "ex post facto clause".

[4]Substitute House Bill 1457, 51st Legislature (1989); Laws of 1989, ch. 259, codified as RCW 9.95.009, .013, .115, and .116.

the petitioners committed their crimes should be applied to determine the time at which they become eligible for parole. Because SHB 1457 extends this amount of time, it violates the ex post facto clause. Therefore, I dissent.

The majority correctly sets forth the test for a violation of the ex post facto clause: whether the law (1) is substantive, rather than procedural; (2) is retrospective; and (3) disadvantages the person affected. Majority opinion, at 185. I agree with the majority that SHB 1457 is substantive and retrospective. The majority then sets forth a 2-pronged analysis to determine whether a law which affects parole is disadvantageous to prisoners: (1) whether the law alters the standard of punishment which existed under prior law; and (2) whether this change is disadvantageous to the prisoner. I agree with the majority that SHB 1457 alters the standard of punishment. The majority states the disadvantage *"appears"* to be the extension of time before which an inmate can be considered for parole. I agree with the petitioners' assertion that SHB 1457 does indeed extend this time and that this extension disadvantages the petitioners. The majority then addresses the second prong by constructing a balancing test between the disadvantages and the ameliorative effects of the law. Majority opinion, at 188-90.

The majority concludes the "ameliorative effects" of SHB 1457 outweigh the disadvantages and therefore the law is not ex post facto. Majority opinion, at 185. I disagree. The majority finds the ameliorative effect of SHB 1457 is that it makes the possibility of parole more determinate and that this gain in determinacy "more than makes up for what is lost in terms of the possibility of early release." Majority opinion, at 185. In so finding, the majority misses the point of petitioners' argument: it is not the *probability* of parole which is of concern to petitioners, but the *increase in time* before they may even be considered eligible for parole. The majority asserts the petitioners are not ensured of a right to less punishment (parole). However, the petitioners do not assert such a

right. Rather, they assert their right is to be considered eligible for parole in accordance with the law as it existed at the time of their convictions. Petitioners assert SHB 1457 lengthens the time before they may be considered eligible for parole.

Under the law as it existed at the time of petitioners' convictions, a prisoner serving a mandatory life sentence was required to serve 20 years (less good time) before he or she would become eligible for parole. In addition, he or she would have to be "certified" as parolable by the superintendent of the penitentiary. Thus, the majority asserts, such prisoners never knew, "until the day they were actually considered for parole, whether and when they would be considered for parole." Majority opinion, at 186. This statement does not address the crucial issue. While they were not *certain* of parole, petitioners knew they would at least be *considered* for parole after serving 20 years.

Under SHB 1457, the petitioners must now serve 25 to 27 years before they may be considered eligible for parole. It is this change in time, whether they are released for parole or not, which is the disadvantage caused by SHB 1457. This amendment was enacted in order to apply the sentencing ranges under the Sentencing Reform Act of 1981 (SRA) to mandatory life prisoners. Thus it affects mandatory life prisoners in three ways: it requires the board to set a minimum term; it states this minimum term must be consistent with the SRA sentencing ranges; and it eliminates the requirement that a warden recommend the prisoner for parole. Comment, *Applying Washington's Sentencing Reform Act to Mandatory Life Prisoners: An Ex Post Facto Violation*, 66 Wash. L. Rev. 229, 234 (1991). Under the SRA, 20 years is the mandatory minimum term, being on the lowest possible end of the scale (*see* RCW 9.94A.120(4) and .310(1)). In making their mandatory minimum terms consistent with the SRA, SHB 1457 sets back petitioners' opportunity for early release by several years. Under the law as it existed

at the time petitioners were convicted, they would become *eligible* for parole after 20 years (former RCW 9.95.115). Under SHB 1457, they will be required to serve more than 20 years before they become eligible.

*Weaver v. Graham*, 450 U.S. 24, 67 L. Ed. 2d 17, 101 S. Ct. 960 (1981) is directly applicable to this case. In *Weaver*, the United States Supreme Court held a retrospective amendment to a parole statute is disadvantageous to a prisoner where it reduces the prisoner's opportunity to receive a shorter sentence. 450 U.S. at 33-35. SHB 1457 extends the petitioners' eligibility for parole date from 20 years to 25 to 27 years, thereby reducing their opportunity to receive a shorter sentence. Under *Weaver*, this retrospective change in the law constitutes an ex post facto violation.

In *Weaver*, the Court held the ameliorative effect must compensate for the harm caused. 450 U.S. at 35. According to the majority, the "ameliorative effect" in this case is the fact prisoners are certain to be considered for parole after serving the minimum term imposed in accordance with the SRA. The elimination of the superintendent's certification somehow brings in an element of determinacy that prisoners *will* be considered for parole. I do not view this as an ameliorative effect. Under the prior law, a prisoner "may" be considered for parole after serving 20 years (less good time). Under SHB 1457, a prisoner "may" be considered for parole after serving a mandatory minimum term, which in petitioners' cases ranges from 25 to 27 years.

The majority holds SHB 1457, as applied to Thompson, violates the ex post facto clause because he was already certified as parolable. Whether a prisoner has been certified is irrelevant. The holding in *Weaver* does not apply only to those prisoners who know when they will be released (like Thompson), but applies as well to the calculation of when prisoners will first be considered eligible for parole (which, in the case of the other petitioners, would be after they have served 20 years). 450 U.S. at 34.

Amendments to parole statutes which clearly delay a prisoner's opportunity for parole are detrimental to a prisoner. *Devine v. New Mexico Dep't of Corrections*, 866 F.2d 339, 343 n.7 (10th Cir. 1989) (citing *Weaver v. Graham, supra*). Contrary to the majority's assertion (at page 194), *Devine* and the other cases cited by petitioners are relevant in that they hold amendments such as SHB 1457 are detrimental (disadvantageous) to prisoners, thereby raising an ex post facto violation.

In *Marshall v. Garrison*, 659 F.2d 440 (4th Cir. 1981), the Fourth Circuit compared new and old parole statutes to determine whether the retrospective application of certain parole criteria disadvantaged prisoners. Under the prior law, parole was based on rehabilitation. Under the new law, parole was based solely on severity of the offense. The court found the retrospective application of the new statute made parole more difficult to obtain because it required the Federal Parole Commission to consider additional criteria when making parole decisions. 659 F.2d at 445. In Marshall's case, this resulted in a lengthening of the period of time he must spend in prison. Therefore, the court held retrospective application of the statute violated the ex post facto clause. 659 F.2d at 444-45.

Similarly, in the present case, the statutory amendment changed the criteria the board must consider in determining a prisoner's eligibility for parole, resulting in a longer period of time which petitioners must spend in prison.

## CONCLUSION

SHB 1457 is retrospective in nature and effects a substantive change in the law. It disadvantages petitioners because it changes the criteria by which the board sets minimum terms. There is no ameliorative effect which outweighs this disadvantage. Therefore, SHB 1457 violates the ex post facto clauses of the federal and state constitutions. I would grant the personal restraint petitions of all four petitioners.

Because I find SHB 1457 is ex post facto, I do not find it necessary to consider the equal protection and due process arguments.

DORE, C.J., and SMITH and JOHNSON, JJ., concur with UTTER, J.