**IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON**

**DIVISION II**

| | |
|---|---|
| STATE OF WASHINGTON, | No. 48788-8-II |
| Respondent, | |
| v. | UNPUBLISHED OPINION |
| SKYLAR NIKOLAS BEAR NEMETZ, | |
| Appellant. | |

BJORGEN, J. — Skylar Nikolas Bear Nemetz mishandled a firearm that discharged and killed his wife. He was charged with first degree murder, but the jury, instead, found him guilty of first degree manslaughter. The jury also returned a special verdict on count I, unanimously agreeing that Nemetz was armed with a firearm when he committed the crime. Due to the firearm enhancement, Nemetz was sentenced to an additional five years. In addition, the sentencing court did not award Nemetz credit for time served on electronic home monitoring (EHM) because the legislature revised former RCW 9.94A.505 (2010) to preclude violent offenders from receiving credit for presentence time served on EHM.

Nemetz appeals his sentence, arguing first that there was insufficient evidence for a rational trier of fact to find that he was "armed with a firearm" within the meaning of former RCW 9.94A.533 (2013). Second, he argues the firearm and deadly weapon sentence enhancement provisions found in former RCW 9.94A.533 should not be applied to an unintentional crime such as first degree manslaughter. To support his argument, he asks us to resort to independent state constitutional grounds to conclude that article I, section 24 of the Washington Constitution is more protective than the Second Amendment to the United States Constitution. Third, Nemetz argues the 2015 amendments to former RCW 9.94A.505, which

formerly provided credit for time served on EHM, violate the federal and state ex post facto clauses as applied to him. Finally, he argues we should decline to award appellate costs.

We hold there was sufficient evidence that Nemetz was armed with a firearm, and we hold that the firearm enhancement applies to both intentional and unintentional felonies. We conclude also that the 2015 amendments to former RCW 9.94A.505 violated the state and federal ex post facto clauses in their application to Nemetz. Finally, we waive appellate costs.

Therefore, we affirm the superior court's imposition of the firearm sentencing enhancement. However, we reverse Nemetz's sentence to the extent it does not credit him for time served on EHM and remand to the superior court to provide Nemetz with credit for time served on EHM.

FACTS

On October 16, 2014, Nemetz mishandled a firearm that discharged and killed Tarrah Danielle Nemetz,[1] his wife.

Nemetz was taken into custody after the shooting. According to a statement he voluntarily provided, Nemetz bought Danielle a DPMS AR-15 rifle for her birthday and left it with her for security while he was gone on a military training operation. When he returned home from the operation, he "thought to [him]self . . . I'll go unload the rifle and I'll put it away because she doesn't need it anymore." Br. of Resp't, App'x. A, at 6.

At trial, Nemetz testified, "I went into the room to put this rifle away. I picked it up, and not paying attention to where that weapon was pointing . . . I picked up the weapon that is in a

---

[1] The record and briefing refer to the decedent as Danielle or Dani. Because the appellant and the decedent share the same last name, this opinion will refer to the decedent as Danielle. No disrespect intended.

state as the same way I left it, unloaded to my knowledge . . . [and] I was standing directly behind Danielle." Verbatim Report of Proceedings (VRP) (Feb. 11, 2016) at 74. He continued,

> I was trying to clear the weapon and I didn't do it correctly, and I made a terrible mistake and the weapon went off in my hands and it struck the back of my wife and hit her in the head and she died.

VRP (Feb. 11, 2016) at 75. Nemetz told the police he must have switched the safety selector from safe to fire, but stated he did not remember doing so. He testified, stating, "I don't recall pulling the trigger but I know the trigger had to be pulled for the weapon to go off." *Id*. at 76. Nemetz stated that he shot Danielle "on accident." *Id*. at 104.

Thomas Rodriguez, Chief of Police for the town of Steilacoom, testified he "was one of the first officers" who responded to the scene. VRP (Jan. 21, 2016) at 39. Rodriguez testified that he and two officers entered Nemetz's apartment and found a young, white female, unresponsive, sitting in a chair with her arms at her side and a large pool of blood beneath her. Rodriguez checked her pulse, but could not detect one. While he was clearing the apartment, he noticed a used shell casing on the floor, which is typically used in an AR-15 or M47 assault rifle. Rodriguez testified Nemetz was making sobbing sounds and said, "I don't know why I can't cry." *Id*. at 47. Rodriguez also testified that "Nemetz . . . stated, quote, 'It was an accident . . . I'm a bad man, I'm a bad man.'" *Id*.

Mark Holthaus, an officer on the scene, testified that when he first encountered Nemetz, he seemed "frantic," and he had blood splatter on his shirt. VRP (Jan. 21, 2016) at 73-75. Another officer on the scene, Darrel Moore, testified that Nemetz told him "he took the rifle magazine out and then he was making it safe and for some reason he shook the rifle and it fired." VRP (Feb. 3, 2016) at 35. "I specifically quote him saying, 'I shook—I just shook it and it shot her.'" *Id*.

Detective Darin Sale testified that they found an "AR 15-style long gun . . . in the closet." VRP (Jan. 25, 2016) at 94. He testified that the rifle "was in . . . fire position and the bolt was closed." VRP (Jan. 26, 2016) at 130. Johan Schoenan, a firearms forensics examiner, testified that "there was nothing wrong with the gun," it "functioned as it was made by the manufacturer." VRP (Feb. 3, 2016) at 60. He testified he performed a "trigger pull analysis and that was normal for this type of gun." *Id*. He testified he performed a "drop test" on the rifle and determined that "it [would] not fire without pulling the trigger." *Id*. at 64-65. He determined that the rifle's safety mechanisms were working properly. *Id*. at 62-63. Finally, Schoenan determined that the characteristics of the casing found at the scene matched characteristics of the casings obtained from test firing Nemetz's rifle. Dr. Thomas Clark testified that he performed an autopsy on the decedent and determined the "[d]eath was due to a gunshot wound to the head." VRP (Feb. 3, 2016) at 117. He "classified it as homicide." *Id*.

On October 30, 2014, the superior court issued an order establishing conditions of release pending trial pursuant to CrR 3.2. On October 31, Nemetz posted the required bail amount, agreed to the conditions of release included in the order, and was thereafter placed on EHM.

On December 31, 2015, the State charged Nemetz by a corrected information with first degree murder. Nemetz's trial began on January 21, 2016. On March 3, the jury found Nemetz not guilty of first degree murder but, instead, found him guilty of the lesser included offense of first degree manslaughter. The jury also returned a special verdict form on count I; they were in unanimous agreement that Nemetz was armed with a firearm when he committed the crime.

Nemetz was sentenced to 102 months on count I, first degree manslaughter. The court also sentenced him to an additional 60 months based on the special verdict. The total sentence

amounted to 162 months of confinement, and the court granted 37 days of credit for time served under former RCW 9.94A.505.

Nemetz appeals.

## ANALYSIS

### I. FIREARM ENHANCEMENT

Nemetz argues that there was insufficient evidence to prove that he was "armed with a firearm" within the meaning of former RCW 9.94A.533(3). We disagree.

### A. Sufficiency of the Evidence

Evidence is sufficient to support a conviction or sentencing enhancement if, viewed in the light most favorable to the State, it permits any rational trier of fact to find the essential elements of the crime beyond a reasonable doubt. *State v. McPherson*, 186 Wn. App. 114, 117, 344 P.3d 1283 (2015). A claim of insufficiency admits the truth of the State's evidence and all reasonable inferences that a trier of fact can draw from that evidence. *State v. Notaro*, 161 Wn. App. 654, 671, 255 P.3d 774 (2011). All reasonable inferences from the evidence must be drawn in favor of the verdict and interpreted strongly against the defendant. *Id.* Circumstantial evidence is no less reliable than direct evidence. *Id.* We must "defer to the trier of fact on issues of conflicting testimony, credibility of witnesses, and the persuasiveness of the evidence." *State v. Thomas*, 150 Wn.2d 821, 874-75, 83 P.3d 970 (2004).

Former RCW 9.94A.533(3) provides, in relevant part:

> The following additional times shall be added to the standard sentence range for felony crimes . . . if the offender . . . was *armed with a firearm* as defined in [former] RCW 9.41.010 [2013] and the offender is being sentenced for one of the crimes listed in this subsection as eligible for any firearm enhancements based on the classification of the completed felony crime.

(Emphasis added.) Former RCW 9.41.010(9) (2013) defines "firearm" as "a weapon or device from which a projectile or projectiles may be fired by an explosive such as gunpowder."

Although former RCW 9.41.010 does not define the term "armed," in *State v. Easterlin*, 159 Wn.2d 203, 205-06, 149 P.3d 366 (2006), the court developed a two-pronged approach to determine whether a defendant was "armed" within the meaning of the statute. First, "[t]he weapon must have been readily accessible and easily available." *Id*. Second, "there must have been some connection between the defendant, the weapon, and the crime." *Id*. Our Supreme Court has construed the term "armed" similarly in subsequent cases. *See, e.g.*, *State v. O'Neal*, 159 Wn.2d 500, 503-04, 150 P.3d 1121 (2007) (quoting *State v. Schelin*, 147 Wn.2d 562, 575-76, 55 P.3d 632 (2002)); *State v. Brown*, 162 Wn.2d 422, 431, 173 P.3d 245 (2007).

For a firearm sentencing enhancement to apply, there must be a nexus between "'the nature of the crime, the type of weapon, and the circumstances under which the weapon is found.'" *Brown*, 162 Wn.2d at 431 (quoting *Schelin*, 147 Wn.2d at 570). The State may punish a defendant for using a weapon in a commission of a crime because a weapon can turn a nonviolent crime into a violent one, increasing the likelihood of death or injury. *State v. Gurske*, 155 Wn.2d 134, 138-39, 118 P.3d 333 (2005). Nevertheless, "the connection between the weapon, the defendant, and the crime is definitional, not an essential element of the crime." *Easterlin*, 159 Wn.2d at 206. *Easterlin* held that "the connection is merely a component of what the State must prove to establish that a particular defendant was armed while committing a particular crime." *Id.*

Nemetz argues that the State must prove that he intended to use the firearm for "offensive or defensive purposes" and that the State failed to prove that he intended to use the firearm for

those purposes. Br. of Appellant at 10. He directs us to *O'Neal*, 159 Wn.2d 500 to support his argument.

In *O'Neal*, our Supreme Court stated, "'A defendant is 'armed' when he or she is within proximity of an easily and readily available deadly weapon for offensive or defensive purposes and when a nexus is established between the defendant, the weapon, and the crime.'" *O'Neal*, 159 Wn.2d at 504 (quoting *Schelin*, 147 Wn.2d at 575-76). When executing a valid search warrant, the officers in *O'Neal* found considerable evidence of drug use and manufacturing and seized more than 20 guns, including weapons from two gun safes, one locked and one unlocked, a loaded rifle in one bedroom, and a loaded semiautomatic pistol under a mattress in a different bedroom. *Id*. at 503. The court held, "The defendant does not have to be armed at the moment of arrest to be armed for purposes of the firearms enhancement." *Id*. at 504. The State's theory that an AR-15 leaning against a wall and the pistol under a mattress were easily accessible and readily available to protect the continuing drug production operation provided a sufficient nexus for a jury to find the defendants were armed. *Id*. at 504-05.

For two reasons, *O'Neal* does not support Nemetz's argument that the State must prove he intended to use the rifle for offensive or defensive purposes. First, *O'Neal* involved constructive possession, while Nemetz actually possessed the rifle used to kill Danielle. Second, *O'Neal* by its terms does not require the claimed showing of intent. Instead, *O'Neal* requires that the defendant be "within proximity of an easily and readily available deadly weapon for offensive or defensive purposes." *Id*. at 503-04. Reading this to require intent would strain its terms and would raise a contradiction with *Easterlin*, which required the firearm to be "readily accessible and easily available" for use, but which did not require intent. 159 Wn.2d at 206.

In this case, Nemetz recklessly possessed and fired the weapon. The AR-15 that killed Danielle was obviously a firearm as contemplated under former RCW 9.41.010(9). Nemetz testified that he decided to put the rifle away, picked it up, tried to clear it, and it accidentally discharged. The rifle was "readily accessible and easily available" for Nemetz's use, which is all that is needed to meet the first prong outlined in *Easterlin*, 159 Wn.2d at 206. Further, there was a clear nexus "between the defendant, the weapon, and the crime," which satisfies the second prong. *Id*. The record contains ample evidence from which the trier of fact could find Nemetz was armed and recklessly shot Danielle. Nemetz testified the "weapon went off in my hands." VRP (Feb. 11, 2016) at 75. At trial, he admitted that he shot Danielle "on accident." *Id*. at 104. His trial testimony alone is more than sufficient for the jury to find a connection between Nemetz and the weapon. Nemetz admitted to mishandling the firearm, which resulted in the crime. Accordingly, we hold Nemetz was "armed" with a firearm under former RCW 9.94A.533(3).[2]

Consequently, there was sufficient evidence to support the sentencing enhancement.

B.    Firearm Enhancement for Unintentional Crimes

Nemetz argues that the state constitutional right to bear arms precludes the imposition of a firearm enhancement for unintentional criminal conduct. To support this argument, he asks us to resort to independent state constitutional grounds. Nemetz argues that we must undertake an analysis under *State v. Gunwall*, 106 Wn.2d 54, 720 P.2d 808 (1986), to determine whether

---

[2] The other essential elements of former RCW 9.94A.533(3) were also present. Nemetz was convicted of first degree manslaughter under RCW 9A.32.060. First degree manslaughter is a class A felony. RCW 9A.32.060(2). Former RCW 9.94A.533(3)(a) provides a sentencing enhancement of "[f]ive years for any felony defined under any law as a class A felony." The judge sentenced him to an additional five years of confinement.

article I, section 24 of the Washington Constitution provides broader protections than the Second Amendment of the United States Constitution.[3] For the following reasons, we disagree.

      1.      Independent State Constitutional Grounds

Constitutional issues are reviewed de novo. *State v. Jorgenson*, 179 Wn.2d 145, 150, 312 P.3d 960 (2013). The Washington Constitution states that "[t]he right of the individual citizen to bear arms in defense of himself, or the State, shall not be impaired." WASH. CONST. art. I, § 24. The Supreme Court has held, though, that while the "right to bear firearms in his home is constitutionally protected, that right ceases when the purpose of bearing firearms is to further the commission of a crime." *Schelin*, 147 Wn.2d at 575. In reaching this holding the court cited with approval the decision in *State v. Sabala*, 44 Wn. App. 444, 449, 723 P.2d 5 (1986), which held that "[t]he right [to bear arms] does not extend to one who is in the process of committing a crime." Consistently with these decisions, Justice Chambers observed in his concurrence in *Gurske*, 155 Wn.2d at 151, that "the use of a weapon in the commission of a crime is not a constitutionally protected activity."

Apart from these more general principles, the Supreme Court held in *Jorgenson* that under article I, section 24, firearm rights are subject to regulation that is "'reasonably necessary to protect public safety or welfare, and substantially related to legitimate ends sought.'" 179 Wn.2d at 156 (quoting *City of Seattle v. Montana*, 129 Wn.2d 583, 594, 919 P.2d 1218 (1996)). Through its at least theoretical deterrent effect, the application of the firearm enhancement to unintentional offenses meets these requirements. Thus, *Jorgenson* makes clear that application of the firearm enhancement to Nemetz's offense does not offend article I, section 24.

---

[3] Nemetz included a *Gunwall* analysis in his briefing.

Nemetz would use article I, section 24 to prevent application of the firearm enhancement to his conviction of manslaughter, because it is an unintentional crime. It is inescapable, though, that the enhancement was based on his use of a firearm in carrying out the crime of manslaughter. Under *Schelin*, *Sabala*, *and Gurske*, that use of a firearm is not protected by the state constitution. Even apart from these principles, the holding of *Jorgenson* would allow the firearm enhancement to be applied to unintentional offenses without violating article I, section 24. Thus, under existing case law, the firearm enhancement may be applied to unintentional conduct under article I, section 24, and we need not engage in a *Gunwall* analysis.

2.      Application of Firearm Sentencing Enhancements To Unintentional Conduct

Firearm enhancements may be applied to unintentional criminal conduct. In *State v. Theilken*, 102 Wn.2d 271, 684 P.2d 709 (1984), Theilken, the victim, and a friend were all visiting at the friend's house. *Id*. at 273. Theilken had his rifle with him, and when the friend left the room a shot was fired, leaving the victim with a gunshot wound to the head. *Id*. Theilken was charged by information with the crime of first degree manslaughter. *Id*. There, as here, Theilken argued that the firearm enhancement statute was not intended to apply to "unintentional" crimes. *Id*. The court determined that the firearm enhancement statute clearly applied to "any felony" committed while armed with a firearm. *Id*. at 275. Moreover, the phrase "any felony" included all crimes designated as felonies by the legislature, regardless of the underlying requisite mental state. *Id*. at 277. Accordingly, our Supreme Court held firearm and deadly weapon sentence enhancement provisions may be applied to unintentional crimes such as first degree manslaughter. *Id*. at 276.

Although *Theilken* addressed a former version of Washington's firearm enhancement statute, the reasoning in this case can be drawn in parallel. Former RCW 9.94A.533(3) applies to

"*felony* crimes . . . if the offender . . . was armed with a firearm." (Emphasis added.) "'Felony' means *any felony* offense under the laws of this state or any federal or out-of-state offense comparable to a felony offense under the laws of this state." Former RCW 9.41.010(6) (emphasis added). From this language, it is clear that the legislature did not intend to restrict the firearm enhancement to felonies having an intentional mental state, since some felonies require a lesser showing of recklessness or criminal negligence. *See, e.g.*, RCW 9A.32.060 (first degree manslaughter; recklessness); RCW 9A.32.070 (second degree manslaughter; criminal negligence); RCW 9A.36.031(d), (f) (third degree assault; criminal negligence).

The phrase "any felony" includes all crimes designated as felonies, regardless of the underlying requisite mental state. *Theilken*, 102 Wn.2d at 277. Thus, we conclude that the legislature intended to include both intentional and unintentional felonies when it expressly applied the firearm sentence enhancement provisions to "any felony" committed while armed with a firearm.

## II.  EX POST FACTO PROTECTIONS

Nemetz argues the 2015 amendments to former RCW 9.94A.505 ("2015 amendments") violate both the state and federal ex post facto clauses as applied to him. We agree.

We review the alleged violation of federal and state ex post facto clauses de novo. *State v. Pillatos*, 159 Wn.2d 459, 469, 150 P.3d 1130 (2007).

> The ex post facto clauses of the federal and state constitutions forbid the State from enacting any law which imposes punishment for an act which was not punishable when committed or increases the quantum of punishment annexed to the crime when it was committed.

*State v. Ward*, 123 Wn.2d 488, 496, 869 P.2d 1062 (1994).

> Critical to relief under the *Ex Post Facto* Clause is not an individual's right to less punishment, but the lack of fair notice and governmental restraint when the

11

legislature increases punishment beyond what was prescribed when the crime was consummated.

*Weaver v. Graham*, 450 U.S. 24, 30, 101 S. Ct. 960, 67 L. Ed. 2d 17 (1981). In applying the clauses, "we must determine whether the new law '(1) is substantive [or] merely procedural; (2) is retrospective (applies to events which occurred before its enactment); and (3) disadvantages the person affected by it.'" *Pillatos*, 159 Wn.2d at 476 (quoting *In re Pers. Restraint of Powell*, 117 Wn.2d 175, 185, 814 P.2d 635 (1991)).

The first question involves whether the statute was substantive, as opposed to merely procedural. Prior to the 2015 amendments, a sentencing court was required to credit a felony defendant's sentence for presentence time spent in "confinement." Former RCW 9.94A.505(6). "Confinement" included "partial confinement," which in turn included "work release" and "home detention." Former RCW 9.94A.030(8), (35) (2012). "Home detention" meant a program of "partial confinement" available to offenders where the offender is confined in a private residence subject to electronic surveillance. Former RCW 9.94A.030(28). Thus, courts were required to credit felony defendants' sentences for time served on EHM because EHM was included in the definition of "home detention," "home detention" was a program of "partial confinement," and "partial confinement" was included in the definition of "confinement."

Through the 2015 amendments, however, former RCW 9.94A.505 was revised, in relevant part, as follows:

> (7) The sentencing court shall not give the offender credit for any time the offender was required to comply with an electronic monitoring program prior to sentencing if the offender was convicted of one of the following offenses:
> (a) A violent offense.

LAWS OF 2015, ch. 287 § 10. First degree manslaughter is a violent offense. Former RCW 9.94A.030(54)(a)(iii).

In *Pillatos*, our Supreme Court decided whether the 2005 amendments of the Sentencing Reform Act of 1981 (SRA)[4] violated the savings statute[5] or the ex post facto clauses of the state and federal constitutions. 159 Wn.2d at 474-75. Specifically, the *Pillatos* court addressed whether the 2005 SRA amendments responding to the United States Supreme Court's decision in *Blakely*[6] applied to cases that had not yet gone to trial prior to the enactment of the amendments. *Id.* at 465. The 2005 SRA amendments gave trial courts the ability to empanel juries to find the aggravating factors necessary for exceptional sentences in sentencing proceedings. *Id.* at 468. The legislature made the amendments effective immediately. *Id.*

Our Supreme Court held that applying the 2005 SRA amendments would not violate the savings statute because the amendments were procedural not substantive. *Id.* at 472. Substantive amendments change either the elements of the offense, the severity of the punishment, or what evidence can be used to prove the offense. *See State v. Hylton*, 154 Wn. App. 945, 956, 226 P.3d 246 (2010); *see State v. Hodgson*, 108 Wn.2d 662, 669-70, 740 P.2d 848 (1987). The Supreme Court stated that because the exceptional sentence was the same before and after the 2005 SRA amendments, nothing in those amendments increased the severity of punishment; thus, the 2005 SRA amendments were procedural. *Pillatos*, 159 Wn.2d at 473.

Nemetz argues that, as applied to him, the 2015 amendments increase the severity of punishment because at sentencing he was not provided credit for presentence time on EHM. The court order establishing conditions of release confined Nemetz to Joint Base Lewis-McChord.

---

[4] LAWS OF 2005, ch. 68.

[5] RCW 10.01.040 requires defendants to be prosecuted under the law in effect at the time the crime was committed.

[6] *Blakely v. Washington*, 542 U.S. 296, 124 S. Ct. 2531, 159 L. Ed. 2d 403 (2004).

The order imposed other conditions that necessarily curtailed his liberty. Unlike in *Pillatos*,[7] Nemetz's presentence EHM confinement could be used to calculate his credit for time served before the 2015 amendments were adopted, but not after. The 2015 amendments essentially abrogated the availability of EHM credit for violent offenders. Therefore, applying our Supreme Court's reasoning in *Pillatos*, the 2015 amendments at issue in this case are substantive because Nemetz was no longer eligible to receive credit for presentence time on EHM, which thereby increased the severity of punishment. As such, we hold the 2015 amendments are substantive in nature.

The State cites *Harris v. Charles*, 171 Wn.2d 455, 256 P.3d 328 (2011), for the proposition that presentence time on EHM is nonpunitive in nature and, therefore, cannot be substantive under ex post facto principles. Yet, *Harris* is distinguishable. Harris was convicted on his guilty plea in the municipal court of two misdemeanors and denied credit for his time on EHM. 171 Wn.2d at 459-60. The Supreme Court was asked, among other things, to determine whether allowing felons, but not misdemeanants, sentencing credit for presentence time on EHM violated equal protection principles. *Id*. at 462-66. It was also asked to determine whether denying misdemeanants' credit for presentence time on EHM violated double jeopardy principles. *Id*. at 467-73.

First, the court held the different classification of felons and misdemeanants for purposes of granting sentencing credit for time on EHM was rationally related to a legitimate governmental interest. *Id*. at 473. The court reasoned that

> [r]equiring courts to grant misdemeanants credit for time on EHM would hinder the
> ability of sentencing judges to order jail time for misdemeanor offenses and would

---

[7] In *Pillatos*, the defendant's prior convictions could be used to calculate his offender score both before and after the 2008 SRA amendments.

limit misdemeanor sentencing courts' discretion to impose sentences for rehabilitative purposes.

*Id*. at 473. Second, the court held that the constitutional protections against multiple punishments did not entitle the defendant credit for his presentence time on EHM. *Id*. at 473.

*Harris* is limited in its application by its focus on equal protection and double jeopardy and by its application to misdemeanants, not felons. The fact remains, under the previous statutory scheme, the legislature did provide felons with credit for presentence time on EHM. The legislature did not provide similar credit to misdemeanants, which was the issue in *Harris*. Nemetz had a reasonable expectation that he would receive credit for the presentence time he served on EHM. Subsequently nullifying that credit increased the quantum of punishment as applied to Nemetz, which is a substantive change.

The second question involves whether the statute operated retrospectively. On a practical level, we consider a statute to be retrospective if the precipitating or triggering event for its application occurred before the effective date of the statute. *Pillatos*, 159 Wn.2d at 471. Here, the triggering or precipitating event was Nemetz's release on EHM on October 31, 2014. The effective date of the 2015 amendments was July 24, 2015. *See* LAWS OF 2015, ch. 287 § 10. Thus, practically speaking, the 2015 amendments operated retrospectively.

However, "'[a] retrospective law, in the legal sense, is one which takes away or impairs vested rights acquired in the existing laws, or creates a new obligation and imposes a new duty, or attaches a new disability, in respect to transactions or considerations already past.'" *Pillatos*, 159 Wn.2d at 471 (quoting *Pape v. Dep't of Labor & Indus.*, 43 Wn.2d 736, 740-41, 264 P.2d 241 (1953)). The Supreme Court has elaborated as follows:

> "A statute does not operate retrospectively merely because it is applied in a case arising from conduct antedating the statute's enactment or upsets expectations based in prior law. Rather, the court must ask whether the new provision attaches new

legal consequences to events completed before its enactment. The conclusion that a particular rule operates retroactively comes at the end of a process of judgment concerning the nature and extent of the change in the law and the degree of connection between the operation of the new rule and a relevant past event."

*Id.* (quoting *Landgraf v. USI Film Prods.*, 511 U.S. 244, 269-70, 114 S. Ct. 1483, 128 L. Ed. 2d 229 (1994) (internal citations omitted)).

Denying Nemetz presentencing EHM credit does result in new legal consequences for him: reduced credit for time served. "A change in the law that limits eligibility for reduced imprisonment violates the ex post facto clause when applied to individuals whose crimes were committed before the law's enactment." *In re Pers. Restraint of Smith*, 139 Wn.2d 199, 208, 986 P.2d 131 (1999) (citing *Weaver*, 450 U.S. at 31-36). The legislature adopted the 2015 amendments after Nemetz committed the crime. Therefore, the statute operated retrospectively on Nemetz.

Finally, a statute must disadvantage a defendant in order for it to violate the ex post facto clauses. *Pillatos*, 159 Wn.2d at 476 (quoting *In re Powell*, 117 Wn.2d at 185). The 2015 amendments would disadvantage defendants if they increase the potential punishment that could be imposed. *Pillatos*, 159 Wn.2d at 476. However, if a defendant had notice of the punishment at the time of the crime, he is not considered disadvantaged by the change in the law. *Id.* at 475. Because Nemetz was not on notice that his presentence EHM would not be used to calculate his time served at the time he committed the crime, the 2015 amendments to the sentencing laws disadvantaged him. The 2015 amendments challenged here essentially abrogated the availability of EHM credit for violent offenders.

The 2015 amendments were substantive, retrospective, and disadvantageous to Nemetz. Therefore, we hold that the application of the 2015 amendments at Nemetz's sentencing hearing violated the ex post facto clauses and that the superior court erred in applying them. The court

should have applied the law in effect at the time he committed the crime and granted him

sentencing credit for time on EHM.

### III. APPELLATE COSTS

Nemetz asks us to exercise our discretion to deny any appellate costs the State requests.

The State has stated it will not seek appellate costs. Given the State's representation, we waive

appellate costs.

### CONCLUSION

We affirm the superior court's imposition of the firearm sentencing enhancement, but we

reverse Nemetz's sentence to the extent it does not credit him for time on EHM. We remand to

the superior court with directions to provide Nemetz with credit for time served on EHM. We

also waive appellate costs imposed against Nemetz.

A majority of the panel having determined that this opinion will not be printed in the

Washington Appellate Reports, but will be filed for public record in accordance with RCW

2.06.040, it is so ordered.

Bjorgen, J.

I concur:

Maxa, C.J.

MELNICK, J. (concur in part, dissent in part) — A trial court is not constitutionally mandated to award a defendant credit for time served on electronic home monitoring (EHM) when it is utilized as a condition of pretrial release. Therefore, a trial court must only give a defendant credit for time served on pretrial EHM if it is required by statute. I dissent because Skylar Nikolas Bear Nemetz should only receive credit for time served on pretrial EHM when the legislature authorized it.[8] When the legislature's amended law to preclude credit for EHM took effect, Nemetz was no longer entitled to credit for pretrial EHM.

The police arrested Nemetz for murder in the first degree. On October 31, 2014, and as one condition of pretrial release pursuant to CrR 3.2, the trial court placed Nemetz on EHM. On March 3, 2016, the court revoked Nemetz's release and placed him in total confinement. On March 25, 2016, the trial court sentenced Nemetz for the crime of manslaughter in the first degree. The court gave Nemetz 37 days credit for time served and did not give him credit for time served on EHM.

While Nemetz was on pretrial EHM, the legislature changed the law relating to credit for pretrial EHM. With an effective date of July 24, 2015, the legislature added a new section to RCW 9.94A.505[9] and disallowed credit for time served on EHM for defendants convicted of a violent offense. RCW 9.94A.505(7); LAWS OF 2015, ch. 287, § 10. The new section stated: "(7) The

---

[8] I concur with the majority that the matter should be sent back to the trial court.

[9] This statute is part of the Sentencing Reform Act of 1981 (SRA), ch. 9.94A RCW.

sentencing court shall not give the offender credit for any time the offender was required to comply with an electronic monitoring program prior to sentencing if the offender was convicted of one of the following offenses: (a) A violent offense." RCW 9.94A.505; LAWS OF 2015, ch. 287, § 10. Both murder in the first degree and manslaughter in the first degree are serious violent and violent offenses. RCW 9.94A.030(46)(a)(i) & (iv), (55)(a)(i) & (iii).

I first part ways with the majority because it decides this case on constitutional grounds. It is well established that we should avoid deciding cases on constitutional grounds if it is not necessary to do so. *State v. Speaks*, 119 Wn.2d 204, 207, 829 P.2d 1096 (1992). It is unnecessary in this case. This case should be decided on the plain language of the applicable statute.

"If the language of a statute is unambiguous, the meaning must be derived solely from the language of the statute. Statutory language clear on its face does not require or permit judicial interpretation." *Speaks*, 119 Wn.2d at 209 (footnote omitted). The applicable statute, RCW 9.94A.505, is clear on its face.

In *Speaks*, the court did not decide the constitutional issue of whether pretrial EHM required credit for time served. 119 Wn.2d at 207. Instead, the court decided that the SRA required the defendant to be given credit for pretrial EHM. *Speaks*, 119 Wn.2d at 207, 209.

Subsequently, in *Harris v. Charles*, 171 Wn.2d 455, 469, 256 P.3d 328 (2011), the Supreme Court determined that a defendant does not have to be credited with time he spent on pretrial EHM. The court declared that, "when EHM is imposed as a condition of pretrial release pursuant to CrR 3.2 or CrRLJ 3.2, it is not intended as punishment but rather as a means of alleviating the burdens of pretrial detention and of assuring the defendant's future appearance in court." *Harris*, 171 Wn.2d at 469 n.10.

In *Harris*, the defendant argued he should be given credit for pretrial time served on EHM. He argued that if he had been convicted of a felony and not a misdemeanor, he would have received the credit. 171 Wn.2d at 460. The court recognized that it made sense in this context to treat misdemeanants differently from felons. *Harris*, 171 Wn.2d at 458-59. The court disallowed credit for time Harris spent on EHM prior to trial. It stated, "When determining whether a defendant is constitutionally entitled to credit for presentencing time spent subject to restrictive conditions, this court has recognized a clear distinction between jail time and nonjail time." *Harris* 171 Wn.2d at 470. Therefore, based on *Harris*, credit for pretrial EHM is not constitutionally required.

As stated in *Harris*, "a defendant in pretrial detention 'is severely handicapped in his defense preparation' and 'is often unable to retain his job and support his family, and is made to suffer the public stigma of incarceration even though he may later be found not guilty.'" *Harris*, 171 Wn.2d at 468 (quoting CRIMINAL RULES TASK FORCE, WASHINGTON PROPOSED RULES OF CRIMINAL PROCEDURE CrR 3.2 cmt. at 22 (1971)). "As a condition of pretrial or presentencing release, EHM addresses these concerns and furthers the intent of the original pretrial release rule because a defendant on EHM may visit his attorney and continue to go to a job." *Harris*, 171 Wn.2d at 469. Pretrial EHM is not punitive. The Minority and Justice Commission proposed adding EHM as an alternative to be used with pretrial release. *Harris*, 171 Wn.2d at 469 (citing Proposed amendment to CrR 3.2, 145 Wn.2d Proposed-67 (Official Advance Sheet No. 4, Jan. 8, 2002)).

In the present case, Nemetz was not constitutionally entitled to credit for pretrial EHM. However, per the SRA, he should have received credit from the time the trial court placed him on EHM on October 31, 2014 until the legislature's amended RCW 9.94A.505(7) took effect on July 24, 2015. Because it is not constitutionally required, the majority's decision to award Nemetz credit for all the time he spent on EHM, even after July 24, 2015, is error.

_____
Melnick, J.